UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
IN THE MATTER OF THE COMPLAINT OF
TRADEWINDS ENVIRONMENTAL                          MEMORANDUM & ORDER
RESTORATION, INC., AS THE OWNER OF                05-CV-0815 (RRM)
A CERTAIN VESSEL FOR EXONERATION
FROM AND LIMITATION OF LIABILITY
-----------------------------------------------------------X
MAUSKOPF, United States District Judge.

Pursuant to this Court's admiralty jurisdiction, Petitioner, Tradewinds Environmental

Restoration, Inc. ("Tradewinds"), commenced this federal limitation and exoneration proceeding

to avoid or to limit any alleged tort liability arising from a July 4, 2004 collision of its vessel

(referred to herein as the "July 4[th] collision/accident"), the "Mr. Lucky," with a family-owned

pleasure boat, the "Sayonara." Following a non-jury trial on the matter, and upon this Court's

Findings of Fact and Conclusions of Law, Tradewinds' exoneration from and/or limitation of

liability is DENIED.

## JURISDICTION

This Court has original jurisdiction in admiralty. 28 U.S.C. § 1333. Pursuant to that

jurisdiction, Tradewinds brings this proceeding under the federal Limitation of Liability Act, 46

U.S.C. §§ 30505 et seq. (2006) (formerly 46 U.S.C. §§ app. 182 et seq. (2005)), and pursuant to

Rule F of the Supplemental Rules of Certain Admiralty and Maritime Claims.

## LIMITATION STANDARD

The Limitation of Liability Act (the "Limitation Act") grants vessel owners the right to

seek exoneration or, alternatively, limit their liability for damages occasioned by the

unseaworthiness or negligent operation of their vessels, provided that the events or

circumstances giving rise to the claim occurred without their privity or knowledge. *See In re*

*PAtlantis Fishing Fleet Corp.*, No. 01-cv-8263(SJF)(ASC), 2004 WL 3704912 (E.D.N.Y. Mar. 22, 2004). Thus, the focus of the instant limitation action is two-part: to determine whether the July 4th collision was the result of Mr. Lucky's unseaworthiness or negligence by its crew, and, if so, whether Tradewinds had culpable knowledge of such conditions.

Claimant carries the initial burden of establishing by a preponderance of the evidence that the injuries complained of were in fact caused by acts of negligence or an unseaworthy condition. *See In re Cornfield*, 365 F. Supp. 2d 271, 276 (E.D.N.Y. 2004); *Cigna Prop. & Casual Ins. Co. v. Bayliner Marine Corp.*, No. 92-CV-7891, 1995 WL 125386 (S.D.N.Y. Mar. 22, 1995). For, "if there was no fault or negligence for the shipowner to be 'privy' to or have 'knowledge' of within the meaning of the statute, there is no liability to be limited," and the owner would then be entitled to exoneration. *In re Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (citations omitted). If the claimant carries that burden, the owner then has the burden of proving that the actionable conduct or condition was without his privity or knowledge. *Id.*

The phrase "privity or knowledge" is a "term of art meaning complicity in the fault that caused the accident." *Blackler v. F. Jacobus Transp. Co.*, 243 F.2d 733, 735 (2d Cir. 1957); *see, e.g., Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1159 (2d Cir. 1978); *see also Potomac Transp., Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 46 (2d Cir. 1990) ("Privity and knowledge under the statute have been construed to mean that a shipowner knew or should have known that a certain condition existed.") (internal quotations omitted). Thus, if the owner, "by prior action or inaction set into motion a chain of circumstances which may be a contributing cause *even though not the immediate or proximate cause of a casualty*, the right to limitation is properly denied." *Tug Ocean Prince*, 584 F.2d at 1158 (emphasis added); *see also Messina*, 574 F.3d at 126.

# FINDINGS OF FACT[1,2]

1.      Tradewinds is an environmental remediation company, in the business of oil spill cleanup, wildlife rehabilitation, wetlands restoration and hazardous waste cleanup. In connection with these activities, Tradewinds owns and operates a fleet of vessels, to which the "Mr. Lucky" – a 25-foot 1985 Boston Whaler Outrage, powered by twin 150-horsepower outboard engines – was added in 1995.[3]

2.      Although Mr. Lucky was corporately owned, as of July 4, 2004, the vessel was used almost exclusively by Tradewinds' Director of Environmental Services, Arthur Baldwin – a top-tier Tradewinds executive responsible for Tradewinds' coastal remediation services, including oversight of Tradewinds' fleet of vessels. In that capacity, Arthur Baldwin, as of the date of the accident, served as Tradewinds' third-ranking officer.

---

[1]      Based upon a preponderance of the credible evidence and arguments presented at trial on June 24, 25, and 26, 2008, the Court sets forth findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

[2]      As the exclusive trier of fact in this case, this Court has reviewed the testimony and reports of Tradewinds' expert witness, Captain John H. Olthuis and Respondent's expert, Captain Ken Wahl. See Pet's Exh. 1, Expert Report of John H. Olthuis, dated Oct. 15, 2006 (the "Olthuis Rep."); Resp's Exh. M, Expert Report of Captain Ken Wahl, dated Sept. 11, 2006, in addition to all witnesses who testified in court.

[3]      Initially, there was some dispute over Mr. Lucky's ownership as of July 2004. In the first place, the vessel was not registered to Tradewinds, but to a sister-affiliate, Sound Coastal Remediation, Inc. -- a then defunct subsidiary of Tradewinds' parent company, Windswept Environmental Group, Inc. Second, as of July 2004, Mr. Lucky was maintained almost exclusively for the personal use of Tradewinds' executive Arthur Baldwin; and was, in fact, operated for recreational purposes by Baldwin's children at the time of the accident. However, on the trial record, this Court concludes that Tradewinds has established sufficient indicia of ownership and control over the vessel, including registration and payment of insurance premiums, to establish ownership for Limitation Act purposes. *See In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 230 (S.D.N.Y. 1968) (recognizing liberal construction of "owner" for Limitation Act purposes); *see also In re Shell Oil Co.*, 780 F. Supp. 1086, 1087, 1089-90 (E.D.La. 1991) (parent corporation that conveyed vessel to subsidiary but retained record title is "owner" because "the act is designed to cover one who is a 'likely target' for liability claims predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation"). Finally, after full opportunity to investigate the question of Mr. Lucky's ownership, Respondent does not challenge Tradewinds' right to bring this limitation action.

3.      Due to Arthur Baldwin's elevated position within Tradewinds' corporate structure, Mr. Lucky served as Arthur Baldwin's personal vessel, to which he had unfettered access; an arrangement known to and authorized by Tradewinds' upper-level management, and which was granted to Arthur Baldwin as a business perk.

4.      Notwithstanding Arthur Baldwin's control over the vessel, the credible testimony at trial was that Tradewinds paid all registration fees, insurance premiums and major maintenance. The vessel was also wintered in a Tradewinds' facility. The vessel remained subject to Tradewinds' professional needs, the Court finds no credible evidence that Mr. Lucky was ever pressed into professional service at any point, and specifically finds the testimony of the Baldwin's to the contrary not credible and wholly self-serving. The Court notes that the vessel was named by Arthur Baldwin, and bore a unique logo of a skull wearing a top hat and smoking a cigarette derived from a tattoo on Baldwin's arm.

5.      In addition to Arthur Baldwin, Tradewinds' also employed his son, Michael Baldwin, as a remediation project manager. Michael Baldwin's duties with Tradewinds included serving from time to time as master of individual Tradewinds' vessels in connection with coastal remediation projects. At the time of the July 4th collision, he held a United States Coast Guard Operator of Uninspected Passenger Vessels (OUPV) License, known as the 6-Pack license, which authorized him to operate small, uninspected passenger vessels, such as charter fishing boats carrying six or fewer passengers for hire.

6.      On July 4, 2004, as was his regular custom, and as further evidence of his regular personal use of Mr. Lucky, Arthur Baldwin permitted his sons, Michael and Christopher Baldwin to use Mr. Lucky for a recreational trip to view the Fourth of July fireworks in Zach's Bay, Long Island. Later that evening, Mr. Lucky collided with another boat, the "Sayonara".

7.      At the time of the incident, Mr. Lucky was piloted by Christopher Baldwin.

8.      Christopher Baldwin had limited experience with vessels of Mr. Lucky's type, and no experience operating Mr. Lucky within the State Boat Channel, where the accident occurred, at night.

9.      At the time of the accident, Michael Baldwin, the holder of a Coast Guard Captain's license and an experienced boat captain, was acting as the designated "look out."

10.      Also onboard were the Baldwins' friends, Charmin and Will Lee.

11.      The Sayonara, a 17-foot Bayliner Capri was owned and operated by Respondent-in-limitation Alfonso Vazquez Sr. (the "Respondent"). The Vasquez family: Alfonso Vazquez Sr., Judith Vazquez, Melissa Vazquez Franco, Diana Morales Vazquez, and Alfonso Vazquez Jr., together with Edward Morales, and Michael Franco (referred to collectively as the "Vazquezes"), were aboard the Sayonara on the evening of July 4, 2004.

12.      Shortly after 10 p.m., following the conclusion of the Fourth of July Fireworks exhibition in the Jones Beach/Zach's Bay area of Long Island, New York, the Sayonara and Mr. Lucky were returning home, and were thus underway in the State Boat Channel east of Zach's Bay. At that time, Mr. Lucky struck Sayonara from astern. The force of the impact drove Mr. Lucky, which was still under power, over the top of the Sayonara's open passenger compartment before Mr. Lucky slid from Sayonara's starboard side and back into the water.

13.      The weather conditions at the time of the accident were calm, clear, and moonless.

14. The speed in the State Boat Channel was 12 mph.[4]

15. At the time of the accident, the applicable speed regulations were indicated on relevant navigational maps and buoys within the State Boat Channel.

16. The credible evidence is that neither Michael Baldwin nor Christopher Baldwin was aware of the applicable speed limit.

17. At the time of the collision, Mr. Lucky was travelling at excessive speed.

18. Christopher Baldwin – at Michael Baldwin's direction – applied full-throttle to the 300-horsepower vessel, attempting to get Mr. Lucky (a planing vessel that, at speed, rides high in the water) up to "plane;" i.e., a level operating height above the water. Pursuant to the credible testimony, this Court finds that Mr. Lucky was at full-throttle for ten seconds prior to the collision. Based upon the credible evidence, ten seconds was sufficient time for a twin-engine vessel as powerful as Mr. Lucky, which was already underway, to exceed the speed limit.

19. Immediately prior to the collision, the Vazquezes did spot Mr. Lucky but there was insufficient time to take evasive action.

20. In addition to excessive speed, this Court finds that Mr. Lucky was operated improperly in several other ways.

21. At the time of the July 4th accident, a 6-foot-in-diameter fully inflated inner-tube raft was affixed to Mr. Lucky's bow. Michael and Christopher Baldwin allowed that raft to remain at the bow even while the vessel was underway. Based upon the credible evidence, this

---

[4] Captain Olthuis' report defines the prevailing speed limits in the State Boat Channel as follows:

> ... the speed of vessels is limited to 10.4 knots (12 mph) in the channel and 3.5 knots (4 mph) in the areas designated as basin or anchorage. This identical wording with regard to speed appears as a notation of NOS Chart 12353. ... In addition to this .... There is "NO WAKE" signage posted at various locations along the channel.

Olthuis Rep. at 3.

Court finds that the placement of that raft substantially obscured the operator's forward sightlines.[5]

22.     In violation of the applicable Inland Navigation Rules, Michael and Christopher Baldwin failed to employ Mr. Lucky's available radar capability in navigating the State Boat Channel at the time of the accident.

23.     In navigating the State Boat Channel on July 4th, no one aboard Mr. Lucky utilized either its roof-mounted searchlight or the available handheld searchlights.

24.     With respect to alcohol consumption in connection with the July 4th collision, this Court finds that Arthur Baldwin permitted his sons to transport alcohol aboard the vessel, but required its consumption to take place exclusively off the boat.  There was no applicable Tradewinds' corporate policy concerning alcohol consumption while aboard or while operating the vessel.

25.     Christopher and Michael Baldwin brought alcohol aboard Mr. Lucky on July 4, 2004.

26.     Michael Baldwin imbibed alcohol that afternoon; which led Michael Baldwin – the more experienced boat operator – to turn over operation of the vessel to his younger brother Christopher Baldwin.  The Court finds insufficient evidence to establish whether Michael Baldwin was intoxicated or whether his consumption of alcohol was a factor in the July 4th accident.

27.     Christopher Baldwin admits to having consumed alcohol early in the afternoon, but denies that he was intoxicated at the time of the accident.  Following the accident, a

---

[5]     Arthur Baldwin was aware that the raft was aboard Mr. Lucky.  He testified that he had seen his sons take the raft from his home earlier that day for use that afternoon.  Respondent contends that the placement of the raft on the bow, in a position that obscured visibility, was customary and well known to Arthur Baldwin, notwithstanding the fact that he was not aboard Mr. Lucky at the time of the accident.  However, this Court finds insufficient evidence that Arthur Baldwin was aware of the placement of the raft at the time of the accident.

7

breathalyzer test was administered to Christopher Baldwin with negative results. Based upon a preponderance of the credible evidence, this Court concludes that Christopher Baldwin's consumption of alcohol was not a causal factor in the July 4th accident.

28.     In addition to operator conduct, and based upon a preponderance of the credible evidence, this Court finds that Mr. Lucky's equipment and configuration contributed to the July 4th accident. Specifically, equipment installations within and without Mr. Lucky's cockpit obscured the operator's sightlines and obscured the vessel's navigation lights, the latter being in violation of the applicable Inland Navigation Rules.

29.     With respect to equipment within the cockpit, Arthur Baldwin personally installed numerous after-market navigational devices, including a fathometer (aka "fishfinder"), a rearview mirror, a GPS display, a ship-to-shore radio set, and a dash-mounted radar display. This Court finds, based on a preponderance of the credible evidence, that theses navigational devices substantially obscured the vessel's sightlines, particularly during planing mode – when the bow is elevated.

30.     The Court adopts the following measurements of the cockpit devices and their respective positions, as set forth in Captain Olthuis' report. The fathometer/fishfinder was mounted from the cockpit overhead near the operator's position. The device hung 9.5 inches down from the overhead and 9.5 inches across. The GPS was mounted on the overhead near the operator's position, and hung 7.0 inches from the overhead and 9.0 inches across. The relative position of the other mounted devices is established by Respondent's exhibit B.

31.     Based upon the credible evidence, this Court finds that from the steering position, a forward view requires the operator to crouch below the hanging fathometer and GPS monitors, both of which prominently obscure a pilot's natural sightline; a clear view to either Mr. Lucky's

8

port or starboard bow similarly requires craning or crouching to see above, below, or around the various other mounted instruments and wiring. Indeed, when describing the steps necessary to obtain an unobstructed forward view from Mr. Lucky's cockpit, Michael and Christopher Baldwin described the ducking, bobbing, and weaving as necessary for safe navigation.

32.     The lack of forward visibility aboard Mr. Lucky caused, at least in part, by the installation of bulky after-market devices was exacerbated by the fact that Mr. Lucky is a so-called "planing vessel," meaning that at speed the vessel's hull rides high in the water. As the vessel accelerates, the bow angles sharply until a level plane is achieved. The effect of the rising bow creates a natural blind spot. The Court finds based on the credible evidence that the after-market instruments in Mr. Lucky's wheelhouse further reduced significantly the already restricted visibility during that maneuver.

33.     In addition to various cockpit instruments, Arthur Baldwin installed an after-market radar dome and searchlight on the cockpit roof. This Court finds based on the credible evidence, that these installations obscured the vessel's "all-around" white light, in violation of applicable boating regulations.[6]

34.     Based on the evidence of Mr. Lucky's obscured lighting configuration, the Court finds that Vazquez family did not have the benefit of the directional and speed information that would have been imparted had Mr. Lucky's navigation lights been unobscured.

35.     With respect to the Sayonara's condition and configuration, this Court finds based on the credible evidence that in accordance with applicable boating regulations, Sayonara's stern pole light was installed and illuminated at the time of the accident.

---

[6]     Inland Navigation Rules 23(c), (d), and (e), require illumination of an "all-round light," "showing an unbroken light over an arc of the horizon of 360 degrees."

36.    This Court finds that Sayonara was overloaded in that carried seven persons, when its maximum capacity is no more than five.

## CONCLUSIONS OF LAW

### I

### Exoneration Denied

As a threshold matter, Tradewinds seeks complete exoneration from liability. In light of the findings of negligence and unseaworthiness discussed more fully below, that relief is denied. Exoneration from liability may be had only in cases where, unlike here, there is no evidence of fault on the part of the shipowner or its crew. *In re Guglielmo*, 897 F.2d 58, 61 (2d Cir. 1990); *Tittle v. Aldacosta*, 544 F.2d 752, 755 (5th Cir. 1977). This Court finds that the Vazequezes have adequately demonstrated, by a preponderance of the credible evidence, culpable conduct sufficient to defeat exoneration. *See Messina*, 574 F.3d at 126 (findings of negligence and/or unseaworhiness preclude exoneration). Specifically, for the reasons discussed more fully below, the Vazquezes have established that the July 4th collision was caused by (a) the Baldwin's negligence in operating Mr. Lucky in the State Boat Channel, and (b) the vessel's unseaworthiness. The Vazquezes have also demonstrated a lack of contributory fault. Exoneration is therefore denied. *Id.*

### A.    Operator Negligence

Respondent has demonstrated acts of crew negligence sufficient to defeat exoneration. With respect to maritime negligence in the collision context, the Inland Navigation Rules and common law principles of admiralty law require prudent seamanship and the exercise of reasonable care in the navigation of a seagoing vessel. *Turecamo Maritime, Inc. v. Weeks Dredge No. 516*, 872 F. Supp. 1215, 1228-29 (S.D.N.Y. 1994) (citing *Williamson Leasing*

10

*Company v. American Commercial Lines, Inc.*, 616 F. Supp. 1330, 1338 (E.D. La. 1985); *see also Berretta v. Tug Vivian Roehrig, LLC*, 259 Fed. Appx. 343, 344 (2d Cir. 2007) (addressing maritime negligence). Violation of the rules of navigation or default in the exercise of prudent seamanship constitute negligence and impose liability on the guilty party, just as is the case in a common law negligence action. *Diesel Tanker Ira S. Bushey, Inc. et al. v. Tug Bruce A. McAllister*, No. 92 Civ. 5559(SS) (THK), 1994 WL 320328, at \*6-7 (S.D.N.Y. June 29, 1994). In this case, the Court's determination of operator negligence is based on the following.

First, Michael and Christopher Baldwin's failed to familiarize themselves with the applicable speed limit in the State Boat Channel and operated the powerful vessel without a knowledgeable understanding of the safety requirements enforced in the State Boat Channel – a condition this Court deems unsafe and unreasonable as stated in the opinion of Tradewinds' own expert, Captain Olthuis, a 20-year Coast Guard veteran and an experienced mariner:

> Both Baldwins were unfamiliar with the exact speed requirements in the State Boat Channel. Had they known and adhered to the 12 mph speed restriction it is doubtful that the collision would have occurred and if it had, the slow relative speed of the two vessels would have greatly mitigated the affects of the collision.

Second, this Court concludes that the application of full-throttle was negligent in that the vessel dangerously exceeded the prudent, well-posted speed limits applicable to the State Boat Channel. In so doing, it is obvious that Michael and Christopher Baldwin breached their general duty of care to nearby boaters by creating an unsafe condition within the narrow, congested, and darkened State Boat Channel. The unreasonableness of speeding through the channel and the causal effect of that conduct in connection with the accident were effectively conceded at trial, and this Court adopts the view best expressed by Captain Olthius, whose report on this issue states as follows:

11

> Michael and Christopher Baldwin's decision to bring Mr. Lucky to full
> throttle in the congested and restricted waters of the State Boat Channel
> *demonstrated bad seamanship* and was in direct violation of New York State
> and local regulations.

Olthuis Rep. at 6.

Third, the Court finds that Michael and Christopher Baldwin negligently failed to maintain a proper lookout – had they done so they would not have collided with another vessel, as they obviously did. Rule 5 of the applicable Inland Navigation Rules requires that "[e]very vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." The undisputed evidence presented at trial indicates that the night was calm and that there was no rain, fog, or any other weather or atmospheric condition that would otherwise have obscured forward sightlines or prevented a reasonably observant lookout from detecting an illuminated 17-foot vessel directly ahead. In this regard, this Court is an agreement with others who have regarded as evidence of a faulty lookout an unexplained failure to see what ought to be seen. *See Andrew v. United States*, 801 F.2d 644, 648 (3d Cir. 1986); *In re Via Sales & Leasing, Inc.*, 499 F. Supp. 2d 887, 890-91 (E.D. Mich. 2007).

Fourth, Michael and Christopher Baldwin negligently failed to employ Mr. Lucky's available radar capability in navigating the State Boat Channel at the time of the accident. Although Michael Baldwin testified that the radar was for oceangoing use only, and would have been rendered useless in the State Boat Channel because the proximity of other boaters and shore fixtures would have returned a jumble of radar images, it is clear that the decision not to employ radar was in violation of the applicable navigation rules. In this regard, Captain Olthius opined

12

that Mr. Lucky's radar should have been "energized" and in use, even when navigating in the congested State Boat Channel:

> Although there was no regulatory requirement for Mr. Lucky to be equipped with radar, the navigation rules clearly state that if a vessel has operational radar it should be used for several purposes, one of which is to ascertain the risk of collision. Mr. Lucky's radar worked at the time of the accident (it was "operational") it just wasn't on. Based upon their experience, Christopher and Michael Baldwin indicated that the radar is useless in the State Boat Channel. I have little doubt that had it been energized the radar picture would have been very cluttered and difficult to interpret and I cannot say whether the proper use of Mr. Lucky's radar would have prevented the accident, however, *by not operating the radar Mr. Lucky was in violation of the Nautical Rules of the Road.*

Olthuis Rep. at 8 (emphasis added). This Court is persuaded that the failure to employ radar as a navigational aid, in violation of applicable navigation rules, contributed to the Baldwin's inability to see what should have been seen, and to avoid collision. *See, e.g., Tug Ocean Prince,* 584 F.2d at 1158 (recognizing use of radar as a navigational aid could have prevented casualty). As such, this Court concludes that it was negligent not to employ radar in this case, and that the failure to do so was a cause of the July 4th accident.

Fifth, the Court finds that Michael and Christopher Baldwin were negligent by allowing a large inflatable raft to remain at the bow of the vessel while underway. The placement of that raft obscured the operator's forward sightlines – a condition that was a contributing cause of the July 4th accident. Indeed, Tradewinds' expert, reached a similar conclusion, stating in part: "[t]he presence of the large inflatable tube on Mr. Lucky's bow also reduced the visibility from the operator's position." Olthuis Rep. at 7. Although, Captain Olthuis opined that the obstruction presented by the raft should have been overcome by a competent operator shifting his viewing position, and thus should not have causally contributed to the collision, this Court rejects that opinion. This Court concludes that a reasonably prudent operator would not have proceeded with such an easily removable obstruction blocking vital sightlines. Moreover, the Baldwin's

13

testified that at no point did they see the Sayonara immediately ahead, a fact that this Court finds was caused by obscured sightlines, including the negligent placement of the raft.

## B.     Contributory Negligence

At trial, the condition and configuration of Sayonara was sharply disputed. Tradewinds alleged that the Sayonara was not properly illuminated and that its overloaded condition made it sit lower in the water and thus made it more difficult to see. The Court rejects those contentions. The credible testimony from on-scene investigators and Alfanso Vazquez Sr. is that Sayonara was properly illuminated. At the time of the accident, the vessel's stern pole light was properly installed, but was damaged in the collision. Second, this Court finds that Sayonara was overloaded, but that that condition did not contribute to the accident. Even in an overloaded condition, the Sayonara should have been sufficiently visible to other boaters operating in a prudent and safe manner. As such, this Court finds that the condition and configuration of Sayonara did not causally contribute to the July 4th accident.

## C.     Mr. Lucky's Unseaworthiness

In this case, Respondent maintains that Mr. Lucky was unseaworthy. For the reasons below, this Court concludes that Mr. Lucky was unseaworthy and that such condition was a cause of the July 4th accident. Based upon the credible evidence, this Court agrees.

In general, "seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." *Tug Ocean Prince*, 584 F.2d at 1155. The duty to operate a seaworthy vessel is "absolute" and "owing to all within the range of its humanitarian policy."

*Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94-95 (1946). Accordingly, seaworthiness turns upon both the proper outfitting of the vessel and the competence of her crew.

The duty is doctrinally independent from negligence. *Johnson v. Donjon Marine Co.*, No. 05-cv-1543, 2006 WL 3240730, *2 (E.D.N.Y. Nov. 8, 2006). Accordingly, so long as an unseaworthy condition exists, the shipowner is liable for the unseaworthy vessel even if "the negligence of the officers of the vessel contributed to its unseaworthiness," *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 100 (1944), even if the negligence of the plaintiff contributed to its unseaworthiness, *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408-09 (1953); *Grillea v. United States*, 232 F.2d 919, 923 (1956) (Hand, J.), and even if the shipowner lacks notice of the unseaworthy condition, *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549-50 (holding that shipowner's actual or constructive notice of a temporary unseaworthy condition is not required to support liability for unseaworthiness). To prevail on an unseaworthiness claim, a plaintiff must prove, by a preponderance of the evidence, the existence of an unseaworthy condition and that that condition was a cause of the complained of injury.

"To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). Thus, the standard for seaworthiness does not bear solely upon the fitness of this ship to stay afloat, but also bears upon its fitness of the vessel for its intended purpose and its intended crew. *Id.* at 1354-55 (vessel found unseaworthy "because, first, it lacked proper equipment for a person only five feet tall to make up an upper bunk in four to six foot seas, and, second, the vessel lacked adequate manpower."). Indeed, "[w]hat may be unseaworthiness in

15

one instance may not be in a different circumstance." *Rogers v. United States*, 452 F.2d 1149, 1154 (5th Cir. 1972). "[T]he doctrine [of seaworthiness] is a growing concept, constantly undergoing redefinition as the risks of those protected are enlarged by changing technology and ship board technique." *Dillon v. M.S. Oriental Inventor*, 426 F.2d 977, 979 (5th Cir. 1970). Finally, it should be noted that for liability to attach, claimant need not demonstrate that the casualty resulted from a single discreet incident; the injury may be shown to be the result of an "accumulation of acts" set into motion by conduct or conditions known or imputable to the shipowner. *Tug Ocean Prince*, 584 F.2d 1158 (accumulation of acts set into motion by action or inaction attributable to shipowner must be deemed causative of the accident).

 For the reasons below, this Court concludes that a finding of unseaworthiness follows from the credible evidence concerning the installation of equipment within Mr. Lucky's cockpit and on its cockpit roof.

### 1. Cockpit Obstructions

 The testimony is undisputed that Arthur Baldwin personally installed numerous after-market navigational devices, including a fathometer, a rearview mirror, a GPS display, a ship-to-shore radio set, and a dash-mounted radar display, and was fully aware of their presence in the cockpit on the day of the accident. In his expert report, Captain Olthuis opined that, "[t]he equipment installation in Mr. Lucky's cockpit area reduces the visibility of the operator when looking forward." Olthuis Rep. at 7. Indeed, Respondent's photographic evidence, Exs. B-466, 468, 469, 472, 493 and 494, illustrates the extent to which these devices and their electrical wiring obscure or impair the pilot's field of vision.

 As evident in the photographs, as described in both parties' expert reports, and as testified to by both Michael and Christopher Baldwin, the numerous devices mounted in Mr. Lucky's

wheelhouse necessarily require the operator to continually shift position in order to see obstacles ahead. From the steering position, a forward view requires the operator to crouch below the hanging fathometer and GPS monitors, both of which prominently obscure a pilot's natural sightline; a clear view to either Mr. Lucky's port or starboard bow similarly requires craning or crouching to see above, below, or around the various other mounted instruments and wiring. In this Court's view, reasonably clear sightlines are essential to the safe navigation of a vessel. *See Memphis & C. Packet Co. v. Overman Carriage Co.*, 93 F. 246 (C.C. Oh. 1899) (finding pilot negligence for proceeding without sufficient forward visibility, resulting in collision), and ducking, bobbing, and weaving should not be necessary. This Court finds, based on a preponderance of the credible evidence, that theses navigational devices substantially obscured the vessel's already narrow sightlines, rendering Mr. Lucky unseaworthy, a condition that caused or contributed to the July 4th collision.

Tradewinds suggests that the need to move about the cockpit in order to properly see objects ahead is akin to a road driver turning his head when changing lanes or parallel parking. The analogy is unpersuasive. While drivers do shift their sightlines, there is seldom any need to do so when negotiating a straight line. Mildly put, given the number and nature of obstructions in this cockpit, the physical gymnastics necessary to avoid collisions with objects directly ahead is sufficient to render Mr. Lucky -- a 25 foot long, 300-horsepower twin-engine, high-speed vessel -- unseaworthy. This finding is further supported by the fact that even with both Michael and Christopher Baldwin in the cockpit, forward visibility was so restricted that even from their respectively different vantage point neither was able to see the Sayonara directly ahead. In sum, the installation of sightline-obscuring equipment rendered Mr. Lucky – a powerful, planing

17

vessel with already limited sightlines – unfit for navigation, particularly on a moonless night and in the congested, narrow State Boat Channel where the accident occurred.

## 2. Navigation Light Obstructions

The undisputed testimony indicates that Arthur Baldwin installed an after-market radar dome and searchlight on the cockpit roof and was fully aware of its position on the day of the accident. This Court finds, by a preponderance of the credible evidence, that these installations obscured the vessel's "all-around" white light, in violation of applicable boating regulations.[7] The loss or diminution of that light deprived other vessels, including the Sayonara, of valuable visual information that may have allowed Sayonara to detect Mr. Lucky's presence and to take evasive action to avoid being struck. The Court finds that the loss of such visual information was the direct result of Arthur Baldwin's negligent installation of certain after-market equipment, which rendered Mr. Lucky unseaworthy and caused or contributed to the July 4th collision.

Tradewinds does not dispute that the installation of the radar dish did, in fact, obscure Mr. Lucky's roof-mounted all-around white light in violation of the Inland Navigation Rules, Captain Olthuis' report states:

> Mr. Lucky's installed navigation light configuration does not comply with the Inland Navigation Rules. This is because the combined all-round white light provided for in Inland Navigation Rule 23(c) does not meet the definition of an all around white light. Although the light fixture itself is proper its visibility is obscured by the vessel's radar antenna over approximately 120 degree arc 60 degrees either side of dead ahead.

Olthuis Rep. at 2.

---

[7]   Inland Navigation Rules 23(c), (d), and (e), require illumination of an "all-round light," "showing an unbroken light over an arc of the horizon of 360 degrees."

Notwithstanding Mr. Lucky's failure to comply with the applicable Rule, Tradewinds argues that that failure was not a contributing factor in the July 4th collision. *See* Olthuis Rep. at 6. This Court finds that position incredible and therefore rejects that conclusion.

The Inland Navigation Rules require certain standard lighting configurations in order to impart vital directional information to surrounding boaters. Based on the visible configuration of a vessel's lights, its size, speed and direction of travel can be readily ascertained. *See* Olthuis Rep. at 6-7. Obscuring that lighting configuration can convey false or confusing information to other boaters, which may increase the likelihood of otherwise avoidable collisions. In this regard, Captain Olthuis opined as follows:

> The Navigation Rules have been meticulously developed so that a vessel's navigational lights provide all the information needed to interpret the aspect of a vessel and thereby to apply the appropriate steering and sailing rule in order to avoid collision. Anything that can reduce the ability of a vessel operator to observe another vessel's navigation lights, by regulation, must be avoided.

Olthuis Rep. at 7.

While the collision in this case occurred suddenly, the Court finds that the obstruction of Mr. Lucky's all-around white light causally contributed to the July 4th accident. Had the light from that required beacon not been obscured, it may have signaled the vessel's approach much sooner; providing Sayonara valuable additional time to determine that Mr. Lucky was on a collision course. As it was, the credible testimony is that when Vazquezes did spot Mr. Lucky it was too late to take evasive action; a circumstance that proper lighting may have prevented. This Court therefore concludes that the Mr. Lucky's obscured lighting configuration – which was an admitted violation of the Inland Navigation Rules – rendered the vessel unseaworthy, a condition that causally contributed to the July 4th collision. Finally, the obstruction of the all-round light need not have been the sole, or even the immediate cause of the accident, it need only be an

19

element that contributed to the casualty (see, *Tug Ocean Prince*, 584 F.2d at 1158), a showing adequately made here.

### 3. Raft Obstruction

As with the unreasonable obstructions caused by the electronic equipment within and without Mr. Lucky's cockpit, this Court further concludes that positioning a raft on the bow rendered the vessel unseaworthy. By affixing the oversized raft to the bow, or permitting it to remain there while the vessel was underway, Michael and Christopher Baldwin created a condition by which the forward sightlines were so obscured as to render the vessel unseaworthy. As stated above, the unreasonable obstruction of Mr. Lucky's sightlines, including by the improper stowage of the large raft, was a causal factor in the July 4th accident. That the raft's placement at the time of the accident may not have been known to Tradewinds does not cure the unseaworthy condition nor does it absolve Tradewinds of liability for unseaworthiness, which functions as a species of strict liability. *See Mitchell*, 362 U.S. 549 ("There is no suggestion in any of the decisions that the duty is less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port, or that the duty is any less with respect to an unseaworthy condition which may be only temporary.").

For the reasons above, Respondents have established culpable conduct in the nature of negligent acts and unseaworthy conditions sufficient to preclude exoneration. Exoneration is therefore denied.

## II

## Limitation of Liability Denied

Alternatively, Tradewinds seeks limitation of liability. To wit, Tradewinds claims that in connection with the July 4th collision, it was without privity or knowledge of the Baldwin's

20

negligent acts or of Mr. Lucky's unseaworthy condition. Tradewinds' defense is unavailing. Based upon the credible evidence adduced at trial, Tradewinds has failed to establish a defense based upon lack of privity and knowledge. To the contrary, this Court concludes that Tradewinds was sufficiently aware of at least some of the factors which led to and caused the July 4th collision.[8] Limitation is therefore denied.

As set forth above, Arthur Baldwin personally installed each of the after-market devices that rendered Mr. Lucky unseaworthy. In so doing, he intended, at least in part, to benefit the Company by enhancing the vessel's professional capabilities. That fact, coupled with Arthur Baldwin's high-ranking position within the corporate hierarchy, is sufficient to impute his personal knowledge of Mr. Lucky's unseaworthiness to Tradewinds. *See Coryell v. Phipps (the Seminole)*, 317 U.S. 406, 410-11 (1943) (recognizing that in the corporate-owner context, an individual's privity and knowledge must be deemed that of the company, else the organization could always limit its liability).

Tradewinds' contention, that Arthur Baldwin does not exercise sufficient executive authority to impute his knowledge to the Company, is unpersuasive. Arthur Baldwin, in his capacity as Tradewinds' Director of Environmental Services, is the third-ranking officer of the Company. In that shore-based role he commands the Company's day-to-day remediation efforts and oversees its vessel fleet. This Court thus concludes that, insofar as it concerns the seaworthiness of Tradewinds' vessels (Mr. Lucky included), Arthur Baldwin enjoys sufficient

---

[8]     Above, this Court finds a lack of evidence to support a finding of privity or knowledge with respect to certain alleged conditions of unseaworthiness. For example, the Court finds no evidence to support Arthur Baldwin's knowledge as to the placement of the raft, which obscured forward sightlines. Notwithstanding that determination, however, a sufficient finding of privity and knowledge as to the equipment installations provides an independent and adequate bases upon which liability is denied. As such, this Court need not address and does not reach other claims of unseaworthiness, including claims of crew incompetence with respect to navigation, or inadequate crew training concerning alcohol consumption. Likewise, because Arthur Baldwin is adjudged to have privity and knowledge of unseaworthy conditions sufficient to impute constructive knowledge to Tradewinds, the Court need not and does not reach the issue of whether such knowledge may also be imputed to Tradewinds by virtue of Michael Baldwin's position as a Tradewinds employee.

corporate rank and privilege to properly impute his knowledge to the Company. Tradewinds'
contrary argument is unpersuasive. While this Court accepts that Arthur Baldwin "was not a
[Tradewinds] board member or director, officer, or shareholder," and that he was "not authorized
to purchase or sell assets or sit on the corporate board or committees," those facts are without
legal significance. *See Cont'l Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376-77 (5th Cir. 1983)
(finding manager of corporate-owner's field operations had sufficient authority to impute
knowledge to the company for limitation purposes, notwithstanding the fact that the manager
was not a corporate officer, director, or shareholder). Notwithstanding the absence of corporate
control or an ownership stake in the company, it is well-settled that privity and knowledge may
still be attributed to a corporation even if, unlike here, the negligent employee has no formal
place in the corporate ranks. *Id.* at n.16. Simply put, "[t]he extent of the employee's
responsibility, not his title, determines whether limitation is foreclosed." *Id.* (internal citations
omitted). Here, the facts adduced at trial – that Arthur Baldwin was directly responsible for
Tradewinds' sea-based operations – present clear circumstances from which to impute his
personal privity and knowledge of Mr. Lucky's unseaworthiness to Tradewinds, the boat's
corporate owner.

Further, Tradewinds' argument that the July 4th accident did not occur in connection with
Tradewinds' business, but rather as a result of a personal pleasure cruise, does not suggest that its
liability should be limited. Tradewinds fails to cite any case law to support its view that the
nature of the accident (*i.e.*, professional versus personal) is relevant to a limitation action.
Indeed, legal authority is to the contrary. *See, e.g., Pritchett v. Kimberling Cove, Inc.*, 568 F.2d
570, 578 (8th Cir. 1978) (denying limitation where corporate owner of rental boat business
authorized after-hours personal use of its vessels to employees and personal injury accident

resulted from such personal use). Moreover, Tradewinds does not allege that Mr. Lucky was stolen or misused, or that the Baldwin family's personal use of that boat was in any other way improper. To the contrary, it is uncontroverted that Mr. Lucky was at Arthur Baldwin's unfettered disposal, and that its availability for such personal use was a compensatory "perk" of his corporate position. Effectively, Tradewinds made such executive "perks" an affirmative component of its business – a business decision for which it can be held responsible.

Finally, the personal use of the vessel does not preclude or limit liability in this case. The cause of the July 4th accident was at least partially attributable to Mr. Lucky's long-standing unseaworthy condition; specifically the commercially-motivated installation of professional navigation gear for Tradewinds' business use, the result of which (a) impaired the pilot's vision, and (b) obscured the vessel's navigation lights to the detriment of other boaters. That unseaworthiness rendered Mr. Lucky unsafe and unfit for any use, personal or professional. In this light, the unseaworthiness presented here must be construed as a species of strict liability, see, *Barlas v. United States*, 279 F. Supp. 2d 201, 205-06 (S.D.N.Y. 2003), and that the vessel's unseaworthiness – of which Tradewinds was wholly aware – manifested itself only during the vessel's recreational rather than professional use is of no moment.

For these reasons, the Court concludes that Tradewinds had sufficient privity and knowledge of the acts and conditions causing the July 4th collision to warrant denial of limitation.

## CONCLUSION

For the reasons above, Petitioner in Limitation Tradewinds' petition for exoneration from or limitation of liability is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
November 10, 2009

*Roslynn R. Mauskopf*

ROSLYNN R. MAUSKOPF
United States District Judge